IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
TEXARKANA DIVISION

UNITED STATES OF AMERICA                                        RESPONDENT

v.                              No. 4:08-cr-40020
                                No. 4:12-cv-4060

BERNIE LAZAR HOFFMAN,                                          MOVANT
*aka*, TONY ALAMO

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Before the Court is the Amended Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C. § 2255 (hereinafter "Motion") filed herein by **BERNIE LAZAR HOFFMAN**, (hereinafter referred to as "Hoffman").[1] ECF No. 186. Hoffman is currently serving a life sentence in the Federal Bureau of Prisons. The Motion was referred for findings of fact, conclusions of law and recommendations for the disposition of the case. A Response was directed by the Court and has been filed. The Court has considered the entire record and, as set out below, recommends this Motion to Vacate, Set Aside, or Correct Sentence be **DENIED**.

I. <u>Procedural Background</u>:

Hoffman was charged by Complaint on September 20, 2008 with violation of Title 18 U.S.C. § 2423 (a), transportation of a minor in interstate commerce with the intent the minor engage in sexual activity for which any person can be charged with a crime. ECF No. 1. Hoffman was arrested on September 25, 2008 in Arizona. On October 1, 2008, the Grand Jury for the Western

---

[1]Movant's original Motion to Vacate was filed on June 11, 2012. ECF No. 176. As discussed at FN 4 below, the Amended Motion to Vacate filed November 28, 2012 (ECF No. 186) is the operative pleading in this matter.

District of Arkansas indicted and charged him with two counts of the same crime.  ECF No. 4.

Hoffman appeared with retained counsel for an initial appearance on the Indictment on October 17,

2008.  ECF No. 12.  He entered a plea of not guilty to all counts and requested a detention hearing.

His trial date was scheduled for November 19, 2008.  ECF No. 15.

On October 22, 2008, Hoffman appeared with counsel for a detention hearing.  ECF No. 25.

After hearing testimony and evidence from the Government, testimony from witnesses for Hoffman,

and argument of counsel, the undersigned ordered Hoffman held without bond pending trial.  ECF

Nos. 25-26.

The November trial date was continued on Hoffman's motion (ECF No. 29), and trial was

rescheduled for February 2, 2009.  ECF No. 31.  On January 7, 2009, Hoffman filed a second motion

requesting a continuance.  ECF No. 39.  The Court granted this motion and extended the trial date

until May 11, 2009.  ECF No. 41.  That date was later changed to May 18, 2009.  ECF No. 42.  On

May 5, 2009, Hoffman yet again requested a continuance and filed a third request for a continuance.

ECF No. 67.  In a ten-page response, the Government objected to this request.  ECF No. 68.  Despite

the Government's objections and in order to afford Hoffman the ability to fully prepare for trial, the

Court granted the Motion for Continuance and rescheduled Hoffman's trial date for July 13, 2009.

ECF No. 70.

A Superceding Indictment was filed on November 19, 2008.  ECF No. 33.  This Superceding

Indictment charged Hoffman with ten (10) counts of violation of 18 U.S.C. § 2423, transportation

of a minor in interstate commerce with the intent the minor engage in sexual activity for which any

person can be charged with a crime.  A Second Superseding Indictment was filed on June 11, 2009

-2-

also charging Hoffman with ten (10) counts of violation of 18 U.S.C. § 2423.  ECF No. 71.[2]

The case was vigorously litigated by counsel for both the Government and Hoffman.  He ultimately went to trial before the Honorable Harry F. Barnes, United States District Judge, on July 13, 2009.  ECF No. 97.  Hoffman was represented at trial by Don E. Ervin, Jeffrey S. Harrelson, and Phillip E. Kuhn.   After eight (8) days of trial and two (2) days of deliberation, the jury returned a guilty verdict as to all ten (10) counts of the Second Superceding Indictment.  ECF No. 107-108. Judge Barnes accepted the jury's verdict and remanded Hoffman to the custody of the United States Marshal pending sentencing.  ECF No. 107.

Hoffman filed a Motion for New Trial (ECF No. 109) alleging the Court erred in denying his motion to suppress, the Court erred in failing to require the Government to reveal the identity of two informants, the Court erred in refusing to order the Government to disclose its original witness interview notes, the Court erred in refusing a defense request to allow inspection of records of counseling for three government witnesses, the Court erred in refusing to allow Hoffman to inspect all of the "FBI 302's" of witness interviews, the Court erred in denying Hoffman's Motion for Judgment of Acquittal based on insufficiency of the evidence, the Court erred in overruling defense objections to certain evidence, the Court erred in requiring witnesses to invoke the Fifth Amendment in front of the jury, the Court erred in allowing "404(b) witnesses," the Court erred in not granting a mistrial during closing statement based on an argument of Government which was a comment on Hoffman's invocation of his Fifth Amendment rights, and the Court erred by denying portions of Hoffman's pre-trial Motion in Limine.

On August 13, 2009, the Government responded to this motion.  ECF No. 112.  Hoffman

---

[2]This Second Superceding Indictment will be referred to hereinafter as the "Indictment"

then filed an Addendum to his Motion for New Trial (ECF No. 113) raising a new ground for a new trial and asserting the criminal trial had infringed on his religious freedom under the First Amendment of the United States Constitution.   Here, Hoffman asserted he had a First Amendment right, according to his religious beliefs, to marry and have sex with women under the age of 18. Judge Barnes denied the Motion for New Trial (including the Addendum) on September 8, 2009. ECF No. 114.

A Presentence Report (PSR) was prepared and sentencing was ultimately set for November 13, 2009.  Both sides submitted briefing and information to the Court to aid in sentencing.  The PSR found a total offense level fifty (50)[3], a criminal history category III, and recommended a sentence of life imprisonment.   In his Sentencing Memorandum and Supplement (ECF Nos. 119 and 121), Hoffman requested a sentence "far below the recommended guideline level of incarceration."  The Government objected to any such departure.

The Court denied the request for downward departure and sentenced Hoffman "for life," with the sentences on all ten counts to be the maximum allowed by law and served consecutively, a total of 2,100 months incarceration.[4]  ECF No. 142-2, p. 329-330.  Hoffman was also sentenced to a term of supervised release for life and a fine of $250,000.00.  ECF No. 129.  The Judgment specifically left open the issue of victim restitution to allow the parties to prepare for a hearing on that issue. Thereafter, an Amended Judgment was entered on January 15, 2010, which awarded $500,000.00

---

[3]This total offense level was based on a multiple-count adjustment provided for in U.S.S.G. §3D1.4.  ECF No. 128.

[4]Hoffman was sentenced for each Count of conviction as follows: Count 1 - 360 months, Count 2 - 360 months, Count 3 - 180 months, Count 4 - 180 months, Count 5 - 120 months, Count 6 - 180 months, Count 7 - 120 months, Count 8 - 120 months, Count 9 - 120 months, and Count 10 - 360 months.  All of these sentences were ordered served consecutively, "for a total term of imprisonment of Life."  ECF No. 129, p. 3.

restitution to each of the five victims in the case.  ECF No. 152, p. 6. A second Amended Judgment was entered on February 8, 2010 to correct clerical errors, but the punishment imposed remained the same.

Hoffman appealed his conviction and sentence.  Hoffman made two claims on appeal.  First, he asserted there was insufficient evidence to support the convictions.  Second, he asserted his sentence was based, at least in part, on Judge Barnes's personal sense of religion.  On December 2, 2010, the United States Court of Appeals for the Eighth Circuit upheld Hoffman's conviction:

> The district court sentenced Hoffman to consecutive terms of imprisonment on all counts, for a total term of life imprisonment. Because there was sufficient evidence to support the verdict on each of the ten counts and the district court appropriately sentenced Hoffman under the United States Sentencing Guidelines (U.S.S.G. or Guidelines) and the Constitution, we affirm.

*United States v. Hoffman*, 626 F.3d 993, 994 (8th Cir. 2010), *cert. denied*, 131 S. Ct. 3004 (2011).

Hoffman's petition for *certiorari* was denied on June 13, 2011.  ECF No. 174.

## II.  <u>Instant Petition</u>:

Hoffman filed a timely Motion to Vacate, Set Aside, or Correct Sentence under 28 U.S.C. §2255 on June 11, 2012.  ECF No. 175.  The Government was ordered to respond and did so on November 8, 2012. ECF No. 184.  Hoffman thereafter filed a First Amended Motion to Vacate, Set Aside or Correct Sentence on November 28, 2012.  ECF No. 186.  Hoffman also moved for discovery (ECF No. 188) and for an evidentiary hearing (ECF No. 187).  His Motion for Discovery was granted in part and denied in part.  ECF Nos. 198 and 204.

In his Motion[5] Hoffman asserts the following claims for relief:

a.  Five claims of ineffective assistance of counsel.

    1.  Failure to timely and effectively object to systematic trial error;

    2.  Failure to adequately prepare or request a continuance;

    3.  Failure to request a mistrial following jury questions;

    4.  Failure to seek a change of venue; and

    5. Ineffective assistance of appellate counsel in failing to raise meritorious arguments on appeal.

b. *Brady* Violations.

    1.  Government failed to disclose impeachment reports; and

    2.  Government intentionally failed to develop restitution or civil suit discovery.

c. Hoffman was denied the right to testify in his own defense.

The Court will address each of these issues.  As a final point (d), the Court will consider the necessity of an evidentiary hearing.[6]

---

[5] I will only consider the claims made in the Amended Motion.  *See In re Atlas Van Lines, Inc.,* 209 F.3d 1064, 1067 (8th Cir. 2000) ("[A]n amended complaint supercedes an original complaint and renders the original complaint without legal effect.").  I note Hoffman made the following claims in the initial Motion filed with the Court, which were not included in the Amended Motion：(1)Ineffective Assistance of Trial Counsel in failing to object to non-pattern jury instructions, (2) Ineffective Assistance of Trial Counsel in failing to request a suppression or *Franks* hearing, (3) The Court erred in striking, then reinstating the testimony of Jennifer Kolbeck and informing the jury of her invocation of the Fifth Amendment, and (4) The Court erred in denying Hoffman's Motion to Suppress Evidence. None of these claims are considered herein as there were not included in the Amended Motion.

[6]The Court requested briefing on the issue of the necessity of an evidentiary hearing, and both parties complied with the Court's request.  As shown below, an evidentiary hearing is not required in this matter.  A separate order will be entered denying the Motion for an Evidentiary Hearing.

### III. <u>Discussion</u>:

A § 2255 motion is fundamentally different from a direct appeal. "Relief under 28 U.S.C. § 2255 is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Section 2255 relief is not intended to correct errors which could have been raised at trial or on direct appeal, unless a movant makes a showing of cause and prejudice, or makes a showing the alleged errors were fundamental defects in the proceeding which resulted in a complete miscarriage of justice. *See Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993).

#### a. <u>Ineffective Assistance of Counsel</u>

Hoffman makes several claims of ineffective assistance of both trial and appellate counsel. In order to prevail on an ineffective assistance of counsel claim, a movant must show: (1) his "trial counsel's performance was so deficient as to fall below an objective standard of reasonable competence"; and (2) "the deficient performance prejudiced [his] defense." *See Toledo v. United States*, 581 F.3d 678, 680 (8th Cir. 2009)(*quoting Nave v. Delo*, 62 F.3d 1024, 1035 (8th Cir.1995)). When considering the first element, there is a "strong presumption that counsel's conduct falls within the wide range of professionally reasonable assistance and sound trial strategy." *Toledo*, 581 F.3d at 680 (*quoting Garrett v. United States*, 78 F.3d 1296, 1301 (8th Cir.1996) (*citing Strickland v. Washington*, 466 U.S. 668, 689,(1984))). "The burden of proving ineffective assistance of counsel rests with the defendant." *United States v. White*, 341 F.3d 673, 678 (8th Cir. 2003)(*citing United States v Cronic*, 466 U.S. 648, 658 (1984)).

Under the first prong of the *Strickland* test, the Court considers counsel's performance objectively and gauges whether it was reasonable "under prevailing professional norms" and "considering all the circumstances." *Fields v. United States*, 201 F.3d 1025, 1027 (8th Cir. 2000)(citation omitted). The Court should examine counsel's challenged conduct at the time of his representation of the defendant and avoid making judgments based on hindsight. *See id.* There is typically no basis for finding a denial of effective counsel unless a defendant can show specific errors that "undermined the reliability of the finding of guilt . . ." *White,* 314 F.3d at 678. If, however, "counsel completely fails to subject the prosecution's case to meaningful adversarial testing, there has been a denial of Sixth Amendment rights making the adversary process presumptively unreliable [and no showing of prejudice is required]." *See id.*

If the Court finds deficient counsel and thus must consider the second prong, prejudice, a defendant must establish "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. Prejudice can only be found if, "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Maynard v. Lockhart*, 981 F.2d 981, 986 (8th Cir. 1992).

**1. Failure to timely and effectively object to systematic trial error**: Movant claims his trial counsel was ineffective for failing to timely and effectively object to "systematic trial error." More specifically, Hoffman claims the "repeated admission of improperly noticed 404(b) and 413 to 415 prior bad acts" as *res gestae* evidence and the failure to object to same was ineffective assistance of counsel. Hoffman asserts the Government failed to give proper and timely notice of

-8-

a number of items of evidence of prior bad acts pursuant to FED R. EVID. 404(b), 413, 414, and 415. Further, he claims the Government likewise failed to give summaries of witnesses' prior bad acts testimony at any time prior to trial, as required by Rules 404(b), 413, 414, and 415.  He claims his trial counsel was ineffective for failing to object to this evidence in a timely fashion.  He further claims when trial counsel did object and the objection was sustained, they failed to seek to have the objectionable evidence struck from the record.  According to Hoffman, these failures had the aggregate effect of denying him a fair trial.

Hoffman makes essentially two arguments here.  First, he argues the individual instances of admission of prior bad act evidence was a result of ineffective assistance of counsel.  Second, he argues the cumulative effect of these instances prejudiced his right to a fair trial.  I will consider all the individual instances first and then will consider the cumulative effect these instances had on Hoffman's trial.

### A.   Individual Instances

Hoffman claims evidence of his prior molestation of the victims of the crimes charged, as well as other minors not named in the Indictment, was unrelated to the charges of interstate travel for purposes of sexual conduct.

He claims evidence of his own molestation of one of the victims when she was 8 years old at his home in Arkansas should have been objected to and not admitted.  Trial counsel, however, did object to this evidence as prejudicial and as having nothing "to do with the counts in the indictment." Judge Barnes over ruled this objection.  T. 394-395.[7]  Thus, Hoffman's claim on this issue is

---

[7]References to the trial transcript will be to "T. ___".  The trial transcript is found at ECF No. 144.

meritless as counsel did precisely what Hoffman says he should have done.

Hoffman also claims evidence of his own sexual intercourse with Jael Sprinkle, a witness not named in the Indictment, was not properly admitted.    Defense counsel objected to any evidence regarding Ms. Sprinkle being admitted. T. 545-49.  The objection covered relevance, prejudice, lack of 404(b) notice, improper 404(b) notice, and no witness summary provided.  Judge Barnes agreed with trial counsel regarding 404(b) and 413 admission but did allow the testimony as *res gestae*.  T. 549-51.    Trial counsel both objected to the contested evidence and obtained at least a partially favorable ruling from the Court.    Again Hoffman's claim in this regard is meritless.

Next, Hoffman claims evidence of beatings and other punishments inflicted on the victims named in the Indictment and other children was improperly admitted.  For instance, he claims testimony from Jael Sprinkle was allowed regarding beatings she incurred at Hoffman's direction. In this case, trial counsel objected to relevance of this testimony, and the Court overruled the objection.  T. 556.  Thus, in this instance, trial counsel did properly object.

He claims trial counsel should have had sought to exclude evidence of child abuse or child labor.  Trial counsel did object to some of this evidence, and his objection was sustained.[8]   T. 321-22, 739. Hoffman claims on these occasions, counsel should have moved to strike.  As noted above,

---

[8] There were a few instances where defense counsel did not object.  However, as these times when Hoffman's defense counsel did not object to a specific instance of abuse (an example at T. 632) or objected belatedly to an instance of abuse (an example at T. 1105), these individual failures are not sufficient to establish ineffective assistance of counsel under the facts in this case.  *See U.S. v. Calhoun,* 721 F.3d 596, 604 (8th Cir. 2013) (recognizing "[t]he ineffective assistance standard is highly deferential to an attorney's judgment, particularly on issues such as whether to object to the introduction of evidence at trial").  This is especially true here because defense counsel had already objected on several occasions to specific instances of child abuse, been overruled by the Court, and may not have wanted to draw extra attention to this type testimony.

there is a strong presumption trial counsel's actions were sound trial strategy.   In these instances, trial counsel objected, and his objections were sustained.  He could have very easily not moved to strike to avoid drawing further attention to the testimony.  The Court should not second guess this decision in light of the totality of the evidence presented at trial against Hoffman.  In other instances ,Hoffman claims trial counsel failed to object to this type of testimony.[9]  T. 620-21, 1075.  In these specific instances, trial counsel did not object to one question about the witness baby sitting or working in at a restaurant.  A decision to not object to a single question about a witness being required to work is one of trial strategy and should not be a basis for an ineffective assistance claim.

He next asserts in support of this claim trial counsel failed to properly object or object at all to various testimonies regarding his "wives" or polygamy.  A review of the record on these instances shows trial counsel either had an objection sustained or overruled.  Nonetheless, objections were made.  Further, Hoffman now says trial counsel should have objected to the terms "one of us," "sisters," "one of Tony's wives" or "resident" because these were references to polygamy.  Hoffman offers no basis for why these terms and phrases could have been precluded from use at the trial in this matter. Trial Counsel did not object to these terms and phrases for good reason, an objection would have been overruled by the trial court as having no basis.  Again, this was a matter of trial strategy.

Hoffman asserts trial counsel failed to object or failed to move to strike evidence of his

---

[9]Hoffman cites the trial transcript of several other instances of testimony regarding child abuse in the form of child labor law violations. However, the referenced pages do not contain such testimony. T. 444, 499, and 558-59.

"hiding assets" and use of aliases.  Again, I have reviewed the relevant transcript pages cited by Hoffman.  The actions of his trial counsel in this regard were proper.  He objected and stopped a line a questioning at (T.375-76), he did not object at (T. 311-12 and 1204) to testimony regarding aliases because that testimony was not objectionable.  Courts generally hold that the use of an alias in an indictment and in evidence is permissible if it is necessary to connect the defendant with the alleged illegal activity. *See United States v. Taylor*, 554 F.2d 200, 203 (5th Cir.1977); *United States v. Skolek*, 474 F.2d 582, 586 (10th Cir.1973). So long as there is no juror confusion caused by the introduction of Hoffman's various aliases, such evidence is allowable.  *See generally United States v. Evans*, 272 F.3d 1069, 1090 (8th Cir. 2001).  In this case, the Government could clearly introduce evidence of a defendant's aliases.  In fact, it alleged one of them in the Indictment, "Tony Alamo."

Hoffman claims trial counsel failed to object to introduction of his prior felony convictions. It was not disputed Hoffman had been in prison in the past.  One witness was asked where Hoffman was living when the witness's family returned to Ft. Smith, Arkansas, and he replied: "He was actually in jail..." T. 319.  Trial counsel objected, and the court overruled the objection.   At one point (T. 613) a witness was asked, "did you see Tony Alamo during that time period when you were 13?"  The witness answered, "We went to visit him in prison."  Government's counsel did not elicit this response.  Trial counsel did not object, presumably to prevent drawing more attention to the fact Hoffman had served at least one prior stint in prison.  On another occasion, a witness responded to a similar question: "Yes, at the prison."  On this occasion, trial counsel objected and the Court instructed the Government's counsel to instruct the witness to refrain from using "prison" in his

answers.  T. 621-22.  On another occasion, a witness referred to Hoffman as living in a "halfway house."  T. 627.  Trial Counsel did not object.  A subsequent witness was asked how often he would see Hoffman at the church.  He responded: "Not at all. . . The first time I saw him was in prison." T. 762.  Government's counsel again moved on to a different topic, not drawing attention to this answer.  Likewise, trial counsel did not object.   There were two other instances of the same sort of testimony.  T. 1058 and 1114.  On neither occasion did the Government elicit the testimony or did trial counsel object.

In none of the instances of Hoffman's prior criminal record being mentioned did the Government elicit the testimony.  Further, the Government immediately moved on without drawing attention to the testimony.  In each case, the witness was attempting to describe where and when he or she had seen Hoffman.  Trial counsel objected at times and did not on others.  At no time was Hoffman's actual prior crime of conviction or the reason for his incarceration placed in evidence for the jury.  In short, there was no prejudice here.  Had trial counsel attempted to strike the testimony, even if successful, the result would have been much more prejudicial to Hoffman.   Trial counsel's actions in this regard were not ineffective assistance.

Next, Hoffman says trial counsel failed to object to evidence of his "unethical or shady" business dealings.  The court sustained objections at times.  T. 501, 519, 968-69.  At other times, there were no objection to questions about Hoffman's or his church's business affairs.  T. 774-75, 1146.  There were numerous questions about the way the church and various businesses were operated, primarily to show the involvement of the various witnesses with Hoffman.  On none of

these occasions was there any mention or reference of unethical or shady business dealings.   Simply put, there was no prejudice to Hoffman by the admission of this evidence.

Hoffman asserts trial counsel failed to object or failed to move to strike evidence of his animosity toward the federal Government or of past "raids" on the church by the Government. Witness Jael Sprinkle was asked why she did not go to authorities when she left Hoffman's church. T. 587.  She answered that Hoffman had told her the FBI, the CIA and the IRS were all part of the "One World Government."  T. 587.   Trial counsel first objected to such testimony, and the Court granted the objection.  Trial counsel then moved for a mistrial. T. 589.  Judge Barnes denied the motion for a mistrial and directed the Government to caution witnesses about straying from the questions asked and cautioned the Government regarding "staying within the confines of the indictment."  Trial counsel asked for a cautionary instruction to the Jury which the Court refused. T. 590.  There were other instances of similar testimony (T. 656-57), and trial counsel objected.  The Government asserted the testimony was all part of its case to show how Hoffman exercised control over the victims.  The Court ordered the Government to shorten its question along these lines.  The conduct of trial counsel in this context was quite simply effective and proper.   There was no prejudice to Hoffman in this limited testimony, and trial counsel effectively limited any broadening of these lines of inquiry.

Finally, Hoffman claims trial counsel failed to object or move to strike evidence of death threats and false allegations made against church members.   One such instance was of Hoffman making a false allegation about a witness putting potatoes rather than noodles in his chicken soup.

-14-

T. 437-41.   The witness testified Hoffman ordered her to fast for several days.  Hoffman told the witness to "shut-up."   Hoffman told the witness and others not to go to the gym across the street. Trial counsel made no objection to this entire testimony and rightly so.  It was not harmful to Hoffman, and objection would simply have drawn more attention to it any event.

Trial counsel did object to testimony about an allegation Hoffman made that a complaining witness had engaged in some sort of sexual things "I've never done in my life."  T. 441.  The Court agreed the testimony was not relevant.  The Government's position was these allegations were simply more evidence of Hoffman's control over the complaining witnesses.   The objection was sustained.  T.443.  Hoffman also threw a complaining witnesses's husband out of the church for no apparent reason.  T. 562-64.   There was no objection from trial counsel, as the Court directed the Government to not stray into irrelevant matters.  T. 564.  Another witness claimed Hoffman told her she looked like a "German whore" once when she was a small child.  T. 801.  There was no objection to this testimony.

While some of the foregoing testimony was in fact determined to be irrelevant to the issues before the Court, none of this testimony was extended and none of it was so prejudicial as to deny Hoffman a fair trial.  A close review of the trial transcript shows trial counsel was diligent in their objections, obtained some favorable rulings from the Court, and were not ineffective in this regard in any specific instance, certainly not to a degree which undermines confidence in Hoffman's right to a fair trial.

**B.     Cumulative Effect of Individual Instances**

In essence, Hoffman's claim in this instance is the failures asserted above, in their aggregate, deprived him of a fair trial. "Errors that are not unconstitutional individually cannot be added together to create a constitutional violation." *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)(citation omitted). "Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief." *Id.* This is still the rule in the Eighth Circuit.

> Forrest contends clear Supreme Court precedent obligated the Missouri Supreme Court to bundle the individual claims of attorney error and determine whether the body of these alleged faults, en masse, overcome *Strickland's* presumption of reasonableness. We do not understand the *Strickland* standard to demand this sort of cumulative performance inquiry, . . .

*Forrest v. Steele*, F.3d 848, 860 (8th Cir. 2014)(citation omitted). None of the individual instances complained of here meet the *Strickland* standard of ineffective assistance of counsel. Hoffman's claim of an aggregate or cumulative failure fails as a matter of law. This claim should be denied.

**2. Failure to adequately prepare or request a continuance**: Next Hoffman claims his trial counsel was ineffective because they failed to adequately prepare for trial or request a fourth continuance[10] in order to give them the opportunity to adequately prepare for trial. With this claim, he asserts his trial counsel's failure resulted in several errors, including: (A) failure to investigate witnesses; (B) failure to effectively cross-examine witnesses; © failure to endorse witnesses Hoffman wanted to be called at trial, and (D) failure to prepare defense witnesses for their testimony.

With Hoffman's third Motion to Continue, trial counsel, Daniel Davis[11], stated he had done

---

[10]Defense counsel did request three different continuances. *See* ECF Nos. 29, 39, and 67. Hoffman, however, claims an additional continuance was required.

[11]Davis withdrew as counsel prior to the trial.

little or no investigation, had not timely received notice of identities of the complaining witnesses from the Government, and had been delayed in receiving discovery from the Government.  He stated a 120 day continuance was necessary to avoid trial counsel being ineffective.  At a hearing on the third Motion to Continue, Hoffman asserts Davis was unprofessional to his co-counsel and displayed a "defeatist" attitude.  On May 8, 2009, the Court granted a 56 day continuance of the trial date from May 18, 2009 until July 13, 2009.  ECF No. 70.  Remaining trial counsel failed to request an additional continuance and, according to Hoffman, were ineffective as a result.

### A.        Failure to Investigate Witnesses

Hoffman claims the failure to obtain a continuance resulted in failure to properly investigate, interview witnesses, or prepare witness for trial.  It is unquestioned that trial counsel had a "duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Whitmore v. Lockhart*, 8 F.3d 614, 618–19 (8th Cir.1993) (*quoting Strickland*, 466 U.S. at 691).

Further, while strategic choices "resulting from lack of diligence in preparation and investigation are not protected by the presumption in favor of counsel," *Armstrong v. Kemna,* 534 F.3d 857, 864 (8th Cir. 2008) (citation ommitted), there is "no per se rule that failure to interview witnesses constitutes ineffective assistance of counsel." *Sanders v. Trickey*, 875 F.2d 205, 209 (8th Cir. 1989).  As with other claims of ineffective assistance of counsel, a claim of lack of witness preparation must show not only what the testimony would or should have been with proper preparation, but also how a witness's testimony "would have probably changed the outcome of the

trial." *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996) (citation omitted).

However, the issue before the Court here is not simply one of strategy, but whether trial counsel was unreasonable in failing to explore such witnesses. Hoffman alleges several instances of potential witnesses not being interviewed and witnesses who were called not being prepared for their testimony. He supports his claim by offering numerous affidavits from the witnesses regarding what their purported testimony could have been. ECF No. 186. I have reviewed all of these submitted affidavits and find either there was no reasonable probability the outcome of the trial would have been different with this testimony, or the affidavit itself shows the proffered witness had no relevant testimony. I have analyzed the examples of such testimony as argued by Hoffman as follows[12]:

<u>Mary Ann Barnett</u> (ECF No. 186-5) allegedly could have testified one of the complaining witnesses, A.E., traveled with Hoffman to Nashville Tennessee. A.E. stayed a short time in Nashville before traveling back to Fouke, Arkansas. This testimony offers nothing other than corroboration of the fact A.E. traveled from Arkansas to Tennessee with Hoffman. It does not help his defense in anyway. Its introduction would not have changed the outcome of this trial at all.

<u>John Peeler</u> (ECF No. 186-6) allegedly could have testified regarding the "long standing efforts by the federal government to attempt to prosecute Movant." First of all, Peeler's affidavit states he was in fact contacted by Hoffman's trial counsel prior to trial. He offered to testify as a "hostile witness." He asserts he could have testified he was an "operative, informant and employee"

---

[12] These are the specific examples summarized in Hoffman's briefing. ECF No. 186 at 23-25. Hoffman has submitted affidavits from other "witnesses" who were allegedly not included in counsel's investigation. *See, e.g.,* ECF No. 186-11 to 186-19. The Court has also closely examined these affidavits and finds there is no reasonably probability their testimony would have changed the outcome of Hoffman's trial.

-18-

of the "Violent Crimes Task Force." He states he could have testified about the Violent Crimes Task Force's effort to build a case against Hoffman in the late 1990s. He says he found no evidence of criminal conduct by Hoffman. None of what Peeler claims he could testify about is beneficial in any way to Hoffman. In fact, such testimony, if elicited, would likely have been held irrelevant or if admitted, would in fact prejudice him. Trial counsel committed no error in deciding not to call Peeler as a witness. Further, there was no reasonable probability this testimony would have changed the outcome of Hoffman's trial.

Debra Ondrisek (ECF No. 186-7) allegedly would have testified she had personal knowledge of complaining witness, S.H., and her trip to California with Hoffman. She would testify S.H. wanted to go on the trip, and that Hoffman did not want to take her. She would testified Hoffman at the last moment agreed to allow S.H. to travel with him to California. In her affidavit, Ondrisek says she was never contacted by trial counsel about the case. Further, she states she was a school teacher at the church controlled by Hoffman, and S.H. was one of her students. She states S.H. appeared to be happy. Notably her affidavit *does not* state Hoffman did not want S.H. to go, rather, "they asked him to allow them to go and he [Hoffman] gave them permission." Just as with other witnesses, nothing this witness allegedly could testify about would have helped Hoffman. In fact, it would corroborate at least part of the government's case. Namely, Hoffman, transported or caused S.H. to be transported across state lines. There was no prejudice in not contacting or calling Ondrisek as a witness. There was no reasonable probability this testimony would have changed the outcome of Hoffman's trial.

Brendan Broderick (ECF No. 186-8) allegedly would have testified that witness N.R. admitted the F.B.I. pressured her and her daughter to testify against Hoffman, and the F.B.I also

-19-

instructed her to send her daughter to WellSpring, a "cult deprogramming" counseling center to induce the daughter to testify.  Hoffman submits no affidavit of Brendan Broderick.  Instead, he submits the affidavit of Brian Broderick, Brendan's father.  This is not a proper proffer of trial testimony and not sufficient to warrant a finding of ineffective assistance of counsel regarding this witness.

Nina Romero (ECF No. 186-9) allegedly could testify she accompanied complaining witness A.E. to Ft. Smith Arkansas in July 1998.  Hoffman says she would testify at no time did A.E. leave the state of Arkansas on this trip; and if she did, it was on her on accord.  Nina Romero's affidavit states she was never contacted by trial counsel.  Notably she *does not* aver in the affidavit A.E. remained in the state of Arkansas for the entire trip.  At best, her testimony would not have helped Hoffman.  There was no reasonable probability this testimony would have changed the outcome of Hoffman's trial.

### B.    Failure to Cross-Examine Witnesses

Hoffman also claims trial counsel's failure to get a continuance resulted in a failure to adequately prepare for cross-examination of the Government's witnesses.  He claims trial counsel opened the door to prior bad act testimony including Hoffman's prison sentences, polygamy practices, and the physical abuse he caused to be inflicted on various church members.  He claims these cross-examinations could have been handled more effectively.  I have reviewed each instance of cross-examination claimed to be defective by Hoffman.  Some of the portions of the record cited by Hoffman do not contain cross-examinations at all (T. 404, 496, 531, and 704-05), and none of the actual cross-examinations complained of show ineffective assistance of counsel.

For example at T. 491, the following exchange takes place between trial counsel and

Government's complaining witness J.O.:

> Q So you're capable of telling an untruth at some time and telling the truth at other times? Would that be a fair assessment?

> A No. When Pastor Alamo makes you not tell the truth, at that time in my life, yes.

> Q Are there other people that can make you say things that aren't true besides Mr. Alamo?

> A No. I was married to him. I lived there for a long time and was forced to do some things that I didn't want to do.

> Q So he's the only person in the world that can make you--

> A Otherwise I would have gotten into a lot of trouble. I would have been beat, I would have been put on fast.

> Q Excuse me. The question is, he is the only person in the world who can make you do this; is that correct?

> A At that time in my life he was.

> Q Is there anybody that can make you do it now?

> A No.

> Q Okay.

There is nothing in this exchange, faulted by Hoffman now, which could have been changed or avoided by "proper" investigation or preparation.

Another example of ineffective cross-examination cited by Hoffman is at T. 675:

> Q December?

> A December is when I went of 2008.

> Q Okay, that's when you went.

> A Yes.

-21-

Q It was suggested to you that you go shortly before that?

A Yes.

Q Okay. And I believe you said you don't know who paid for it.

A I don't know who paid for it. I know I did not pay for it.

Q You didn't pay for it. Okay. And when you - you got there in December.

A Yes.

Q How long did you stay?

A Two weeks.

Q You stayed two weeks?

A Yes.

Q And did they tell you anything about the Alamo church?

A They weren't - no, they didn't tell us about the Alamo church. They told us - they were just telling us about cults and things.

Q There was no discussion about the Alamo church?

A No, we did not talk about the Alamo church. I talked to my counselor, but--

Again, a review of this cross-examination reveals nothing which could have turned out any differently with a different sort of investigation or cross-examination.  Further, this discussion involves a witness's treatment at a counseling center, and the Government disclosed the information prior to trial.

All of the claimed instances of ineffective cross-examination are the same.  None of them reveal anything which could have been done better or more effectively with a different sort of investigation or preparation.  There was no prejudice to Hoffman in this regard.

-22-

### C.  Failure to Endorse Witnesses at Trial

Next, Hoffman claims his trial counsel failed to "endorse several witnesses" he wanted to call at this trial, thus preventing those witnesses from testifying.  Hoffman refers to a portion of the transcript of the trial in support of this claim.  T. 1579-80.   The following occurred on the record, in chambers, with counsel and the Court on the next to last day of the trial:

> MR. ERVIN: Your Honor, this morning we got thrown a curve. Mr. Alamo had previously told us that he would not testify. This morning he came in and he wants to testify. He has mood swings. He also wants to call witnesses that we do not have on our witness list. This has kind of thrown our camp into disarray and I know that when we return to the courtroom you're going to ask me to call my next witness and I'm not ready to call a witness because of this development.
>
> THE COURT: I'm not going to let you because you haven't given the names to the government.

The fact a lawyer makes a decision to not call a witness is "a virtually unchallengeable" decision of trial strategy.  *See United States v. Staples*, 410 F.3d 484, 488-89 (8th Cir. 2005).  Nothing here suggests trial counsel refused to consider possible defense witnesses.  Rather, this exchange shows Hoffman, at the last moment, attempted to add witnesses to his trial list.  His counsel properly brought this to the Court's attention, and just as properly the Court indicated it would not allow any of these last minute witnesses to testify.  There was no ineffective assistance of counsel in this instance.

### D.  Failure to Prepare Defense Witnesses for Trial

Hoffman next claims his trial counsel inadequately prepared a witness for trial, which led to prior bad act testimony.  He claims defense witness Sue Davis, mother of one of the victims of Hoffman's crimes (A.E.), was not adequately prepared.   He claims she now says she only met the defense investigator hours before her testimony and "never spoke to anyone else on the defense

team." ECF No. 186, p. 26.   He claims Ms. Davis did not know what the lawyers even looked like and was given no preparation for what sort of questions would be asked.   *See id.*

However, a review of her affidavit attached to the § 2255 motion shows otherwise.  She states she met with defense counsel four or five days prior to the trial for at least thirty minutes.  She does state she felt unprepared for her testimony.  She states she became confused on the stand about where she had lived at various times.  She also admits she invoked her rights under the Fifth Amendment and her testimony ceased when asked about the location of her remaining children.  She states in her affidavit if she had been adequately prepared she would have testified her victim daughter was lying about Hoffman's conduct and was a good actress.  Ms. Davis also states in her affidavit her son told her A.E. told him she had been offered money to testify and promised by someone she would be relocated after the trial.

I have thoroughly reviewed the trial testimony of Ms. Davis as well as her affidavit now proffered by Hoffman.  First, trial counsel clearly met with and discussed her testimony prior to Ms. Davis taking the stand.  Hoffman's claim to the contrary is simply untrue based on the affidavit he himself submits here.  Trial counsel was not ineffective in this instance.  Further, nothing Ms. Davis now says she could have testified about would have resulted in a probability the trial's outcome would have been different.  Her confusion about where she lived, and when, would have had no impact at all on the outcome of the trial.  At best, it would have conflicted with the testimony of A.E.  The only possible exculpatory testimony she now says she could have offered is inadmissible hearsay from her son about what A.E. supposedly said regarding being paid money to testify.  As noted above, Defense counsel fully cross-examined the victims on this issue during the Government's case in chief.

-24-

Next Hoffman claims trial counsel failed to properly investigate the case which lead to two witnesses, Ms. Davis and Jennifer Kolbek, raising the Fifth Amendment privilege. Hoffman claims this greatly undermined their credibility. He claims trial counsel should have "anticipated" their need to raise the Fifth Amendment. While it is likely these witnesses' credibility was indeed undermined, it was not because of trial counsel's conduct. Judge Barnes initially struck Ms. Kolbek's testimony after she raised the Fifth Amendment privilege. He then reinstated her testimony and subsequently allowed Ms. Davis to testify as well. These matters were discussed by counsel and the court prior to the witnesses taking the stand. There was no lack of preparation or investigation. The witnesses, the lawyers, and Hoffman all were aware of what would happen. In short, there was no failure to "properly investigate" on this issue.

Lastly, on this point, Hoffman claims trial counsel failed to effectively question the victims about bias arising from an expectation of restitution or damages from a civil suit. Again, I have thoroughly reviewed the trial transcript and the cross-examination of the complaining witnesses in this case. Trial counsel's cross-examination was thorough and detailed. The victims were questioned about government-provided counseling, cell phones, Christmas gifts and discussions with government agents regarding restitution or civil lawsuits. For example, trial counsel cross-examined D.K. as follows:

> Q All right. I want to talk to you a moment about some of the benefits that you might have received from the government prior to your testifying today. You were given counseling at Wellspring, I believe, in Ohio?
>
> A Yes, I was.
>
> Q And the government paid $5000 for your two weeks of counseling?

A Yes, sir.

Q Were you in - did you and Ms. Orlando and Ms. Eddy go to counseling at the same time?

A Yes, we did.

. . .

Q Okay. It was an in-house counseling program; wasn't it?

A Yes, it was.

Q So you were there 24-hours a day for two weeks?

A Well, it was separate, I mean, it was separate counseling. We had workshop which was watching videos during the day, which we all did together, but we had separate counseling with the actual counselor separately.

. . .

Q All right. Did you have group counseling sessions together?

A Once.

Q Once? And how long did that group counseling session last?

A I would say maybe an hour.

Q All right.  And did you discuss, did you and Ms. Orlando and Ms. Eddy discuss your background and what you allege happened at the church in that group session?

A No, we were not allowed to.

Q Did you discuss at that time the upcoming trial and what you anticipated your testimony was going to be?

A We were not allowed to.

Q You didn't compare any notes with Ms. Orlando or Ms. Eddy at Wellspring?

A No, I did not.

-26-

Q And did the programming include any kind of hypnosis?

A No, it did not.

Q All right. I believe you were also, have also been furnished by the United States Attorney's Office toiletries, pillow, blanket, magazines, candy, gun and mints that were purchased by the United States Attorney's Office.

A Yes.

ECF No. 144-1, p. 94-96.  In short, there was no lack of preparation, and no reasonable probability the outcome would have been different had trial counsel been "more prepared."

Further, Hoffman requested permission to expand the record in this case to include responses to requests for admission made by the victims regarding restitution and the possibility of a civil law suit with Government officials prior to the criminal trial at issue here.  ECF No. 216, Order Denying Expansion of Record.  Hoffman says these discussions were never disclosed by the Government and were denied by the victims at trial.  However, a review of the materials Hoffman wanted to include in the record on this issue clearly indicate the victims each denied any discussion with government officials regarding a possible civil law suit against him.  Hoffman's contention such discussion took place is simply not accurate and there is no way trial counsel could have changed those facts with more preparation.

Regarding the issue of restitution, pursuant the Victim's Rights and Restitution Act and the Crime Victim's Rights Act, the Government had an obligation to inform the victims of the possibility of restitution in this case.  *See*, 42 U.S.C. § 10607 and 18 U.S.C. § 3771.  It is clear from the trial record Hoffman's counsel was aware of the services provided the victims by the Government as there was specific cross-examination on these issues.  Again, no amount of preparation would have

-27-

changed how trial counsel cross-examined the victims on these issues.  Nor would more preparation have changed the outcome of this trial.

**3.  Failure to Request a Mistrial Following Jury's Questions**: Hoffman's next claim of ineffective assistance of counsel is that trial counsel should have requested a mistrial following questions sent to the Court during jury deliberations.  The first question sent by the Jury was: "Does the person who transported the alleged victims have to know a crime was being committed, or planned? By definition, does the defendant have to have an aider or abetter to be guilty of knowingly transporting a victim in interstate commerce?" T. 1677.  The Court responded to the Jury as follows: "Please refer to the jury instruction on aiding and abetting and only the defendant is charged in the count." T. 1677.   Trial counsel objected to the Court's response as inadmissible, interference with the jury, and as a comment on the evidence.  This objection was overruled.  Hoffman now claims this response improperly "signaled to the jury that it was not necessary for them to determine that [Hoffman] had an aider and abetter, or that their burden in determining that fact was less than beyond a reasonable doubt."  He claims a necessary element of the offense charged was "aided and abetted by others."

The second question sent by the jury was: "did [Hoffman] have to have sexual conduct or intercourse out of state to be charged?  It happened in Fouke, AR before trip and after return to Fouke, AR., while on the trip.  We don't understand the definition." T. 1678.  Judge Barnes answered, "I cant answer the Question.  Please refer to the instructions." Hoffman makes no specific claim of how this response by the Court was in error, but claims trial counsel should have moved for a mistrial.

"The United States Supreme Court has recognized that there are varying degrees of necessity

and a 'high degree' of necessity must exist before a mistrial is appropriate." *United States v. Melius*, 123 F.3d 1134, 1138 (8th Cir. 1997).  For trial counsel to be ineffective in not requesting a mistrial, there must first be established a basis for the mistrial.  *See Pryor v. Norris*, 103 F.3d 710, 714 (8th Cir. 1997).   There is no error when a trial judge directs a jury's attention to a specific part of the instructions when responding to a question.  *See Weeks v. Angelone*, 528 U.S. 225, 226 (2000).  "A jury is presumed both to follow its instructions, and to understand a judge's answer to its question(s)."  *Id.* (citations omitted).  Possible juror bias falls near the deadlocked jury end of the spectrum of possible mistrial scenarios and the trial court's decision to declare a mistrial or not on that ground is entitled to "great deference."  *United States v. Dixon*, 913 F.2d 1305, 1311 (8th Cir. 1990).

To establish ineffective assistance here, Hoffman needs to show a request for a mistrial would have in reasonable probability been granted.  *See generally, Strickland*, 466 U.S. at 694. Hoffman makes no such showing here. He claims Judge Barnes's response to the first question somehow lessened the burden of proof below beyond a reasonable doubt.  Nothing in the response to the first question remotely does that.  There was no confusion at anytime in this trial about whether anyone else was charged in the Indictment.  A review of the Court's  responses shows in both instances Judge Barnes referred the jury back to the jury instructions themselves.  He did not, by his answers, "influence or coerce" the jury to reach any particular verdict.  He did not alter the burden of proof.   There was certainly no "high degree" of necessity to grant a mistrial in order to preserve Hoffman's right to a fair trial here.   Simply put, to request a mistrial would have been futile, and there was no ineffective assistance of counsel in not doing so.

4.  **Failure to Seek Change of Venue**: Hoffman's next claim is his trial counsel were

-29-

ineffective in failing to seek a change of venue.  He says the notoriety of his case demanded a change of venue.  Additionally, he claims the "cursory" nature of the voir dire regarding the influence of pretrial publicity compounded this problem.  There is no dispute the case had numerous news paper articles printed about it in the months leading up to the trial.  Moreover, Hoffman sets out the following news accounts he claims tainted his right to a fair trial:  articles labeling him as the "Fouke Monster" or requesting that citizens contact law enforcement if they observed any members of his church distributing literature.  ECF No. 186 p. 33.  He claims "These articles and the widespread notoriety of the case resulted in pervasive negative preconceptions of Movant by members of the community leading up to Movant's trial, such that Movant could not receive a fair trial in southwestern Arkansas."  ECF No. 186 p. 33.  He attempts to tie this press coverage with what he claims was the Jury's expressed confusion about the law applied to the case and the "close factual questions on several of the counts charged in the indictment."  ECF No. 186 p. 34.  Notably, Hoffman does not claim any specific prejudice as a result of this pretrial publicity.

In support of his claim of unfair pretrial publicity, he offers three affidavits and a letter. Chuck Thomas avers by affidavit he resides in Crawford County, Arkansas.  He states the residents of Crawford County were "flooded" with media accounts of this case.  He admits the news stories typically did not pertain to the facts alleged in the Indictment.  Mr. Thomas says many members of the community in Crawford County, Arkansas felt Hoffman was guilty as a result of the Indictment. ECF No. 186-29.  I note Crawford County, while within the Western District of Arkansas, is well outside the geographic boundaries of the Texarkana Division, and no potential jurors were drawn from Crawford County for this case.

Mr. James White avers by affidavit he lives in Alma, Arkansas, which is also in Crawford

-30-

County.  He claims residents "across the state of Arkansas" were exposed to news stories about Hoffman's case.  He says the news coverage was always negative.  ECF No. 186-30.  Again, Alma, Arkansas is well outside the geographic boundaries of the Texarkana Division of this court and no potential jurors were drawn from Crawford County.

Ms. Terri White avers by affidavit she is a Fouke Arkansas resident.  She states during the trial of this case in 2009, the media stories about Hoffman were "negative and relentless."  The media stories always portrayed him as guilty according to Ms. White.  ECF No. 186-16.

Finally, Hoffman presents a letter purportedly written by a Mr. George Speer.  In this letter, Mr. Speer indicates he worked in the Fouke, Arkansas community for several years prior to the trial in this matter.  During that time, he had daily interactions with members of Hoffman's church.  He says all of the media stories about the church appear to have "convicted the ministry and its leaders before ever going to court."  Notably Mr. Speer does not note any story specifically about Hoffman or the criminal trial at issue.

Other than one news paper story he alleges named him the "Fouke Monster," Hoffman gives no specific indication of what the negative media stories were about.  He also fails to indicate any specific prejudice he suffered as result of any such media coverage.  He does not even specifically allege the jury pool was tainted in any particular way.   The general statements of negative publicity, two of which came from locations far removed from the actual jury pool, are insufficient to raise this presumption.  The one bit of information, Ms. White's affidavit,  offered specifically about media accounts which might have affected potential jurors, merely says the accounts were "negative and relentless."

In *United States v. Allee*, 299 F.3d 996 (8th Cir. 2002), the Court stated that the mere

-31-

existence of press coverage is "not sufficient to create a presumption of inherent prejudice and thus warrant a change of venue. To create a presumption, the coverage must be inflammatory or accusatory." The Eighth Circuit uses a two-tiered analysis for determining whether there is prejudicial pre-trial publicity such that a change of venue was needed.

> We employ a two-tiered analysis when the motion is based on pretrial publicity. The tier-one analysis involves a determination of whether the pretrial publicity was so extensive and corrupting that unfairness of constitutional magnitude must be presumed. Id. If no such determination is made, we move to the second tier of the analysis, which is a determination "whether the jury-selection process established an inference of actual prejudice." In making this determination, "[w]e must independently evaluate the voir dire testimony of the impaneled jury in order to determine whether an impartial jury was selected, thus obviating the necessity for a change of venue." Thus, under either tier of the analysis, we will reverse only if a change of venue would have been necessary to protect the defendant's right to a fair trial.

*Allee*, 299 F.3d at 1000 (citation omitted). Here, Hoffman points to widespread news coverage of his trial, while only giving one specific instance of negative coverage. As noted above, the mere existence of press coverage does not create a presumption. *See id.* In *Allee* language in press reports such as defendant "should pay forever," defendant engaged in a "series of 'Bonnie and Clyde' getaways," were "very dangerous individuals who do not have regard for life," and defendants were "linked to [a] long list of crimes" was not deemed specifically inflammatory or accusatory to the defendant. *See id.* There is no evidence of anything remotely like those comments in the pre-trial publicity leading up to Hoffman's trial. There was no indication the accounts set out by Hoffman were either inflammatory or accusatory. Accordingly, there is no presumption of inherent prejudice here and under the first tier of this analysis the claim fails.

It also fails under the second tier of the analysis for change of venue. The Court's initial qualification of the jury panel was conducted with two groups of potential jurors. Each of the

-32-

general questions sessions by Judge Barnes began by the Court reading the Indictment and then with asking a general question such as "Do you and each of you have a state of mind with reference to the charge against the defendant which would in any way prevent you from acting impartially?" T. 72, 96. Judge Barnes then further inquired by asking generally if potential jurors could eliminate and disregard everything that you have heard or read concerning this case and render an impartial verdict based solely on the evidence presented in this courtroom?" T. 75, 100-01. Several potential jurors were excused during Judge Barnes's questioning for having already formed an opinion, for having been a victim of sexual assault themselves, or having heard about the case. T. 72-75, 96-99, 101-102.

As pointed out above, there has been no showing of inflammatory or accusatory press coverage prior to the trial. The precautions Judge Barnes took during the general voir dire were sufficient and indeed resulted in many potential jurors being excused for cause as a result of pre-conceived opinions or other reasons. Change of venue would not have been appropriate under the applicable standard here even if trial counsel had requested it. Accordingly, Hoffman has not met his burden of showing that his trial counsel was deficient in not seeking a change of venue, or that he was prejudiced by the failure to do so.

**5. Failure to Raise Meritorious Arguments on Appeal**: Next, Hoffman claims his appellate counsel was ineffective in not raising several meritorious arguments on appeal. Appellate counsel raised two issues on appeal. Namely, insufficiency of the evidence and an error at sentencing. Hoffman now claims the following issues should have been raised:

-improper systematic admission of Rule 404(b) and Rule 413-15 evidence,

-improper answer by Judge Barnes to jury question number 1, and

-Judge Barnes's reference to two defense witness's invocation of their Fifth Amendment privilege.

All of these issues are raised as part of Hoffman's claim of ineffective assistance of counsel discussed above.  As discussed, none of the issues proffered were meritorious.  "The question here is not whether counsel's choice to omit the hearsay issue on appeal was an intelligent or effective decision, 'but rather whether his decision was an unreasonable one which only an incompetent attorney would adopt.'"  *Garrett v. United States*, 78 F.3d 1296, 1305 (8th Cir. 1996).  Because the claims here are not meritorious to begin with, Hoffman cannot establish appellate counsel was deficient in failing to raise them on appeal.  Thus, the Court need not reach the issue of prejudice.

### b.  Brady/Giglio Violations

Hoffman claims the Government violated the mandate of *Brady* and *Giglio*, in failing to disclose certain exculpatory evidence.  He makes two claims in this regard.

**1.  Failure to disclose impeachment evidence**: Hoffman claims the Government failed to disclose FBI  and Arkansas State Police ("ASP") reports detailing interviews with witnesses which contained impeachment evidence.  He claims the Government falsely represented to the Court and trial counsel it had turned over all FBI witness interview reports ("FBI-302") prior to trial when in fact it had not done so. Hoffman claims additional FBI-302s and ASP reports were discovered in a subsequent civil case also filed in this Court.[13]  Hoffman's current counsel admits he has access to many of the alleged impeachment or exculpatory documents but is bound by a protective order in the civil case.  The Government maintains no impeachment or exculpatory material was withheld

---

[13]*Kolbeck, et al, v Twenty First Century Holiness Tabernacle Church, et al*, Civ No. 10-cv-4124.

from discovery in the instant criminal trial.

To establish a Brady violation, defendant bears the burden of showing: (1) that the government suppressed evidence, either willfully or inadvertently; (2) that the evidence was favorable to her, either because it was exculpatory or impeaching; and (3) that it was material to the outcome at trial. *See Masten v. United States*, 752 F.3d 1142, 1146 (8th Cir. 2014). "Under *Giglio v. United States*, the government must disclose matters that affect the credibility of prosecution witnesses." *United States v. Jeanpierre*, 636 F.3d 416, 423 (8th Cir. 2011), *quoting United States v. Morton*, 412 F.3d 901, 906 (8th Cir.2005). *Brady* and *Giglio* encompass "evidence known only to police investigators and not to the prosecutor. In order to comply with *Brady*, therefore, the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case, including the police." *Strickler v. Greene*, 527 U.S. 263, 280-81 (1999) (citations omitted). However, prosecutors are not required to deliver their entire file to defense counsel, but rather, they must disclose evidence favorable to the accused that, if not disclosed, would deprive the defendant of a fair trial. *United States v. Bagley*, 473 U.S. 667, 675 (1985).

This issue was previously considered by the Court in its resolution of Hoffman's motions for discovery and to expand the record in this § 2255 proceeding. Hoffman was granted some limited discovery regarding this issue. ECF Nos. 198 and 204. Despite his assertion there was impeachment and exculpatory evidence in these alleged ASP and FBI-302 reports and despite the court ordering some limited discovery on these issues, Hoffman has produced no such report in support of his § 2255 motion. Further, Hoffman admits he has had access to the documents from the civil case, since at least November 28, 2012.

Following his Motion for Discovery and the Court's ruling on that motion, Hoffman moved to expand the record in this case. ECF No. 211. Specifically, he claimed documents from the following categories should be included in the record in this case: (1) Arkansas State Police documents allegedly reflecting the efforts by a third party, "S.G.," in encouraging the prosecution of the Movant; (2) documents allegedly reflecting the involvement of the Wellspring Center in offering counseling to the victims in this case during the prosecution; and (3) Requests for Admission from a civil case allegedly reflecting the victims's discussion of possible restitution with government officials during the prosecution. He claimed all of the foregoing should have been disclosed as *Brady* material during the underlying criminal case. I fully reviewed all of the proffered materials as set out in the Order of August 8, 2014. ECF No, 216. I found none of the documents requested to expand the record necessary to the resolution of the claims in this motion and will not repeat that analysis here.

He did offer 103 pages of excerpts from the ASP investigative file in his Motion to Expand the Record. ECF No. 211-1. I have again reviewed all of the proffered documents, which consist in large part as emails from "S.G." who appears to be an informant giving information to the ASP during the investigation of Hoffman's crimes. There is no exculpatory information contained in this material. The majority of the information, if it were admissible at all, is highly incriminating toward Hoffman. Further, and contrary to Hoffman's assertions, there are no ASP interview reports or FBI-302 interview reports at all contained in this information, much less any containing exculpatory or impeachment evidence.

**2. Failure to Develop Restitution/Civil Suit Discovery**: Hoffman next claims the Government violated *Brady/Giglio* by intentionally failing to "discuss issues of potential restitution

-36-

and the possibility of civil suit" with the victims of his crimes prior to the trial.  He claims there was a *Brady/Giglio* violation by the Government failing to disclose the "potential" an investigating agent would later act as an investigator for the victims in the subsequently filed civil suit against him.

"Impeachment evidence may be material under the *Brady* doctrine as long as 'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *United States v. Pulliam*, 566 F.3d 784, 787 (8th Cir. 2009).  Here, Hoffman cannot show the asserted information exists.  He affirmatively asserts the Government intentionally did not discuss restitution or a civil suit with the victims.  In fact, in his Motion for Discovery, Hoffman claimed, either the discussions occurred and he was not told **or** they did not occur in order to avoid having to disclose them.  ECF No. 188, p. 4.  Further, as noted in this Court's prior Order regarding discovery (ECF No. 198), it appears at least one of the victims may have discussed restitution with the Government prior to trial.  Accordingly, the Court ordered limited discovery regarding these exact issues on April 15, 2013.  ECF No. 198.  Judge Barnes ordered slightly more discovery in his review of my Order and allowed Hoffman to actually subpoena ASP and FBI materials relating to certain aspects of the investigation.  ECF No. 204.  Despite his ability to obtain any such information following those orders, to date, Hoffman has not provided any information to the Court in support of this claim.  As noted above, the information Hoffman offered in his Motion to Expand the Record was highly incriminating rather than exculpatory.

Here, Hoffman merely speculates as to what, if any, evidence exists to support his claim.  As I noted in the preceding section, he has been granted some limited discovery to establish his claims.  He has produced no information which in fact supports it.  Hoffman has not met his burden that the Government suppressed any evidence, that any such alleged evidence would have been favorable to

-37-

him, or that there is a reasonable probability the outcome of the trial would have been different if what he alleges actually exists.

The fact remains Hoffman has shown no documents or information which suggest any material *Brady/Giglio* evidence was withheld in this case.  The documents he did proffer to expand the record fell far short of showing any reasonable probability of a different outcome and in fact would have greatly bolstered the Government's case for conviction.  This claim should be denied.

**c. Denial of the Right to Testify**: Hoffman next claims he was denied his right to testify in his own defense, because his trial counsel "made promises" to address various issues with the jury and then failed to do so.  This essentially is an additional claim of ineffective assistance of counsel.  There is no dispute a criminal defendant has the right to testify if he so chooses.  *See Rock v. Arkansas*, 483 U.S. 44, 49 (1987).

> Because the right to testify is a fundamental constitutional guarantee, only the defendant is empowered to waive the right. A defendant's waiver of this right must be made knowingly and voluntarily. We have previously held that a knowing and voluntary waiver of the right may be found based on a defendant's silence when his counsel rests without calling him to testify. We stressed that under such circumstances the defendant must act affirmatively rather than apparently acquiesc[ing] in his counsel's advice that he not testify, and then later claim[ing] that his will to testify was overcome.

*Frey v. Schuetzle*, 151 F.3d 893, 898 (8th Cir. 1998) (citations omitted).

Near the end of Hoffman's defense in this case, the following exchange took place in chambers outside the presence of the jury:

> MR. ERVIN: Your Honor, this morning we got thrown a curve. Mr. Alamo had previously told us that he would not testify. This morning he came in and he wants to testify. He has mood swings. He also wants to call witnesses that we do not have on our witness list. This has kind of thrown our camp into disarray and I know that when we return to the courtroom you're going to ask me to call my next witness and I'm not ready to call a witness because of this development.

. . .

MR. HARRELSON: We've discussed his possible testimony this morning and it's my opinion that us even asking the questions into the issues that he wants are going to be inadmissible and objectionable. We don't want to damage our integrity with the jury and it's my understanding he basically wants to testify in a narrative.

THE COURT: I'm not going to let him do that.

MR. HARRELSON: I understand. And that's the dilemma that we have is that our client wants to pursue a theory of defense that we think is irrelevant and hurts our case so far. Obviously, we have the strategy decision about what questions to ask him, but I think the areas he wants to testify on are not going to be admissible.

THE COURT: It may well be that I'll have to stop him from testifying and put him in this room over here where he can observe the rest of the trial via television.

T. 1579-1581.  Then the following exchange took place between Judge Barnes and Hoffman, again

on the record and outside the presence of the jury.

THE COURT: It is my understanding that during that recess the team of lawyers and Mr. Alamo discussed the possibility of testifying in court. I was informed moments ago that Mr. Alamo does not wish to testify. I want to assure that that's the case and is that your desire?

THE DEFENDANT: That really wasn't my desire because I don't believe the attorneys covered all the situations during the testimonies on the other side. There is some of the things that they said that couldn't be anyway, such as the fact any kind of illegitimate child--

THE COURT: They are correct, as I understand the rape shield.

THE DEFENDANT: Yes, Desiree has a real sexual past and there are so many other things. Like for instance, when they brought up Viagra, for instance, I have a urinary problem because of Diabetes and so Tommy let me use some of it. What it would do, it would open my urinary tract so I could go to the bathroom. And you know, it's like sex, sex.

THE COURT: Mr. Alamo, I know all of that. I'm just asking, are you going to take the stand? Do you wish to or not wish to?

THE DEFENDANT: I mean if they have agreed to do what they said they'd do.

THE COURT: It's no agreement with me.

THE DEFENDANT: What's that?

THE COURT: It's no agreement with me. I just want to know that you realize you have a constitutional right to take the stand and if you do not, that's acceptable with me.

MR. ERVIN: I think Mr. Alamo was trying to say, we had a long conference.

THE COURT: That's why I gave you that - most of the morning.

THE DEFENDANT: So we agree

MR. ERVIN: We're in agreement of what we will do.

THE DEFENDANT: They stated they would cover some of the things that I told them. If that's the case, then it's all right, I won't take the stand.

THE COURT: And you understand it's your right to do that?

THE DEFENDANT: Oh, yes, sir.

THE COURT: Well thank you very much.

THE DEFENDANT: Thank you, sir.

THE COURT: Now, let me go on. Do you have any other witnesses?

MR. ERVIN: No, Your Honor.

T. 1586-87.  It is apparent from the record of the trial, Judge Barnes gave Hoffman and his lawyers a recess in order to allow them to fully discuss the issue of his testimony.  It is equally apparent, he wanted certain issues to be raised to the jury, which his counsel believed were inadmissible or would actually hurt his case. Further, even given the most favorable interpretation of the record, Hoffman knew that counsel would argue only "some of the things" he indicated to them he wanted to argued to the jury.  It was clear at the time Judge Barnes questioned him, there were no further witnesses

to be called.   He was not "denied" the right to testify and in fact, Judge Barnes told him quite clearly, "I just want to know that you realize you have a constitutional right to take the stand."  In the end, after being fully advised of his rights, Hoffman elected not to testify.   Hoffman voluntarily and knowingly waived his right to testify.  *See Frey* 151 F.3d at 898.  This claim should be denied.

        **d.  Evidentiary hearing**:  Finally, based on the record in this case, the Court also concludes an evidentiary hearing is not required in this matter.  Hoffman is not entitled to the relief he seeks.[14] Further, I find Hoffman has not made a substantial showing of the denial of a constitutional right, and any request for a certificate of appealability should be denied as well.

## IV.  Recommendation

        Accordingly, based on the foregoing, it is recommended the instant Amended Motion to Vacate, Set Aside or Correct Sentence (including the original Motion) be **DENIED** and dismissed. I also recommend any request of a certificate of appealability be **DENIED**.

        **The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger *de novo* review by the district court.**

        **DATED** this **18th day of November 2014.**


                         /s/ Barry A. Bryant
                        HON. BARRY A. BRYANT
                        U.S. MAGISTRATE JUDGE

---

[14] *See Buster v. United States*, 447 F.3d 1130, 1132 (8th Cir.2006) (holding that a § 2255 motion can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact).